THE PEOPLE *ex rel.* DANNY R. JONES, County Treasurer, Plaintiff-Appellee,
*v.* RALPH ADAMS *et al.*, Defendants-Objectors-Appellants.

Fifth District   No. 75-109

Opinion filed July 9, 1976.

Robert S. Hill, of Benton, for appellants.

William F. Meehan, of Cairo, for appellee.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:
The defendants, landowners in Franklin County, Illinois, appeal from a judgment of the circuit court of Franklin County which overruled their objections to taxes levied upon their lands for the years 1971 and 1972.

The principal questions in this appeal are whether farmers, as a class, are denied equal protection of the laws by the levying of burdensome real estate taxes upon their farms, and whether the parents of school-aged children who reside in poor school districts are denied equal protection of the laws by Illinois' method of financing public education, in violation of the fourteenth amendment to the United States Constitution and article I, section 2, of the 1970 Illinois Constitution.

The defendants, of whom there are about 228, all own land in Franklin County, Illinois. Some are farmers and some are parents of school-aged

children who live in Franklin County. The record does not show which defendants fit within either or both of these categories.

Two hundred and five of the defendants paid their real estate taxes for 1971 under protest, in accordance with section 194 of the Revenue Act (Ill. Rev. Stat. 1971, ch. 120, par. 675). Pursuant to sections 232 and 235 of the Act (Ill. Rev. Stat. 1971, ch. 120, pars. 713, 716), the treasurer of Franklin County, as the ex-officio tax collector, made a list of the lands on which taxes had been paid under protest, and applied to the circuit court of Franklin County for a judgment for the amount of the taxes. The defendants filed written objections to the taxes as required by section 235 of the Act (Ill. Rev. Stat. 1971, ch. 120, par. 716). The defendants did not attach to the written objections original or duplicate tax collectors' receipts showing that the taxes had been paid.

One hundred and twenty-one of the defendants paid their 1972 real estate taxes under protest. The county treasurer, as the ex-officio collector, again applied to the circuit court for a judgment for the taxes. The defendants filed their written objections but did not attach collectors' receipts to the objections.

The proceeding on the first application was delayed. The two applications were consolidated and heard together.

On April 25, 1974, the People (hereinafter called the "collector") moved to dismiss the defendants' objections. The motion was denied. The collector later moved to sever the objections of the defendants and to require the defendants to object individually in separate actions. This motion was also denied.

On September 23, 1974, a hearing was held on the applications and objections. The defendants called as a witness an agricultural economist who testified that Illinois' system of real property taxation places a heavy burden on the State's farmers. He said that real estate taxes consume about 2% of the average Illinois citizen's gross income, but about 21% of the gross income of most farmers. The economist testified also that real estate taxes were onerous because of their inflexibility; that is, the usual amount of real estate tax accrues for a farmer even though bad weather may have ruined his crops.

An employee of the Illinois Department of Local Government Affairs testified that the governor of Illinois had ordered the department to issue to all counties in Illinois property tax multipliers for 1972 which were identical to the multipliers issued for 1971, in apparent disregard of section 130 of the Revenue Act (Ill. Rev. Stat. 1971, ch. 120, par. 611).

No witness testified for the defendants concerning the alleged inequities of Illinois' manner of financing public schools. The defendants introduced several exhibits in evidence, however, which contained information relevant to this subject. One exhibit, the Illinois Statistical

Report for 1972, published by the State of Illinois, showed in a table that Franklin County was able to raise only $462 in real estate taxes per student enrolled in the county's public schools, far below the State average of $627 in real estate taxes per enrolled student, even though the tax rate in Franklin County was $2.68 per $100 of equalized assessed valuation slightly above the State average of $2.64 per $100 of equalized assessed valuation. The defendants introduced in evidence tax collectors' receipts which showed that the defendants had paid their real estate taxes for 1971 and 1972 under protest.

On October 24, 1974, the circuit court entered a judgment in favor of the collector for the amount of the defendants' real estate taxes for 1971 and 1972, and overruled the objections to the taxes.

The defendants appeal. The collector attempts to cross-appeal from the order of the circuit court denying his motion to dismiss the objections.

The defendants and the collector advance the same arguments on appeal as at trial. The arguments are lengthy, but they must be set forth in order to facilitate an understanding of this case.

The defendants first contend that article IX, section 4(b), of the 1970 Illinois Constitution, which allows counties with a population of more than 200,000 to classify real property for the purposes of taxation, violates the equal protection clause of the fourteenth amendment to the United States Constitution. The defendants assert that such a division of counties on the basis of population arbitrarily discriminates against landowners in counties having 200,000 people or less, who would probably receive a low classification for their land if their counties were allowed to classify real property.

The defendants argue, second, that the fixing of the 1972 property tax multipliers at the level of the 1971 multipliers was a violation of the equal protection clauses of the Federal and State constitutions because it forced landowners in Franklin County to pay a higher rate of real estate tax for 1972 than landowners in other counties paid.

Third, the defendants assert that Illinois' present scheme of real estate taxation arbitrarily discriminates against farmers by requiring them to pay nine or ten times more of their gross income in real estate taxes than the average citizen of Illinois must pay. Such discrimination, the defendants argue, amounts to a violation of the equal protection clauses of the United States Constitution and the 1970 Illinois Constitution.

The defendants argue, fourth, that Illinois' method of financing public schools, which depends to a large extent on the revenue that school districts can raise from local real estate taxes, invidiously discriminates against school-aged children and their parents who live in poor school districts, in contravention of the equal protection clauses of the State and Federal constitutions.

In response, the collector argues that a circuit court has only limited jurisdiction in a proceeding under section 235 of the Revenue Act (Ill. Rev. Stat. 1971, ch. 120, par. 716), which will not allow it to decide constitutional questions such as those the defendants raise. The collector also asserts that the defendants' failure to attach tax collectors' receipts to their written objections precluded the circuit court from entertaining their objections under section 235. The collector argues finally that the circuit court erred in not severing the objections for a trial of each defendant's objections separately.

The question whether this court has appellate jurisdiction over this case will first be considered. Formerly, under section 237 of the Revenue Act (Ill. Rev. Stat. 1969, ch. 120, par. 718), old Illinois Supreme Court Rule 302(a) (Ill. Rev. Stat. 1969, ch. 110A, par. 302(a)), and article VI, section 5, of the 1870 Illinois Constitution, an appeal from a judgment of a circuit court in a tax case had to be taken directly to the Illinois Supreme Court. This has been changed, however, by article VI, section 4(a) of the 1970 Illinois Constitution and new Illinois Supreme Court Rule 302(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 302(a)). Now an appeal from a judgment of a circuit court in a proceeding under section 235 of the Revenue Act (Ill. Rev. Stat. 1971, ch. 120, par. 716) must be taken to the Illinois Appellate Court. (6 Nichols, Illinois Civil Practice §6703 (1975).) The court, therefore, has appellate jurisdiction over this case.

■■ The arguments advanced by the collector will next be considered. No part of the final judgment of the circuit court was adverse to the collector, so the collector could not make a cross-appeal from that judgment. (*People v. Bradford*, 372 Ill. 63, 22 N.E.2d 691; *Bullman v. Cooper*, 362 Ill. 469, 200 N.E. 173.) Despite the inappropriateness of his attempt to make a cross-appeal, the collector can still urge his arguments upon this court because they tend to support the judgment below on grounds revealed by the record. That the circuit court based its decision on other grounds revealed by the record does not hinder the collector from making these arguments. *People v. Bradford; Bullman v. Cooper.*

The collector's assertion that taxpayers cannot challenge the constitutionality of the Revenue Act and other statutes in a proceeding under section 235 of the Revenue Act is erroneous. There are basically only two ways in which a taxpayer can attack a real estate tax levied upon his land. He may, in a few cases, seek declaratory or injunctive relief before he pays the tax, or he may pay the tax under protest and then object in a proceeding held in accordance with section 235 of the Revenue Act. The availability to the taxpayer of declaratory or injunctive relief is severely restricted, however, and his usual remedy is to pay the tax under protest and to object as provided in section 235. (*La Salle National Bank v. County of Cook*, 57 Ill. 2d 318, 312 N.E.2d 252.) Even when

declaratory or injunctive relief is available to the taxpayer, it is additional to, and not exclusive of, the relief the taxpayer may have under section 235 of the Revenue Act. (*Clarendon Associates v. Korzen*, 56 Ill. 2d 101, 306 N.E.2d 299.) Thus a taxpayer is never required to seek relief from a real estate tax by means of a suit for an injunction or declaratory judgment, rather than by objecting under section 235. To say, as the collector does, that a taxpayer must raise certain constitutional defenses against a real estate tax in a suit for an injunction or declaratory judgment, rather than in a proceeding under section 235 of the Revenue Act, is inconsistent with this rule. Consistency demands that a taxpayer be allowed to raise all his defenses, including challenges to the constitutionality of the Revenue Act and other statutes, in a proceeding under section 235. (See *La Salle National Bank v. County of Cook*, 57 Ill. 2d 318, 324, 312 N.E.2d 252, 255.) The defendants, therefore, properly introduced all their constitutional arguments in the proceeding below.

■■ The collector rightly asserts that the defendants should have attached tax collectors' receipts, showing that they had paid their real estate taxes under protest, to their written objections. (Ill. Rev. Stat. 1971, ch. 120, par. 716; *People ex rel. Brenza v. Anderson*, 411 Ill. 252, 103 N.E.2d 629; *People ex rel. Voorhees v. Chicago, Burlington & Quincy R.R. Co.*, 386 Ill. 200, 53 N.E.2d 963.) The defendants' failure to do so, however, was made inconsequential by their introducing in evidence their tax collectors' receipts at the hearing held under section 235 of the Revenue Act. The receipts proved that the defendants had, indeed, paid their real estate taxes under protest. (See *People ex rel. Wisdom v. Chicago, Burlington & Quincy R.R. Co.*, 32 Ill. 2d 434, 206 N.E.2d 702.) Thus, if the circuit court had granted the collector's motion to dismiss the objections unaccompanied by receipts, as it should have done, the defendants undoubtedly would have moved to amend the objections by attaching the receipts, and the circuit court would have had to grant the motion to amend. (*People ex rel. Anderson v. Chicago & Eastern Illinois R.R. Co.*, 399 Ill. 520, 78 N.E.2d 265.) There would have then been a hearing on the merits of the objections even if the collector's motion had been granted, just as there was a hearing on the merits of the objections after the collector's motion was denied. In other words, the circuit court's refusal to grant the collector's motion to dismiss the objections on a technical ground was harmless error. See *Rowan v. Kirkpatrick*, 14 Ill. 1, 5.

■■ The collector's assertion that the circuit court should have severed the defendants' objections because of improper joinder is also correct. Taxpayers may join in objecting to real estate taxes in a proceeding under section 235 of the Revenue Act if all the objections made apply to each taxpayer and if presenting the objections in a single proceeding would not

cause confusion. (*Lackey v. Pulaski Drainage District*, 4 Ill. 2d 72, 122 N.E.2d 257; *People ex rel. Vaughn v. Welch*, 252 Ill. 167, 96 N.E. 991.) The defendants have advanced constitutional arguments applicable to two different classes, farmers and parents of school-aged children, but not all the defendants are members of both classes. The circuit court should have granted the collector's motion for severance to the extent of requiring the defendants who were not members of both classes to object in other proceedings. The circuit court's error, however, is rendered inconsequential by the decision this court reaches on the merits of the objections.

■■ An understanding of the defendants' initial argument will be aided by defining the word "classification" as it is used in connection with real estate taxation. Classification refers to the categorizing of real property according to its use, for the purpose of determining at which percentage of fair market value the property should be assessed. Article IX, section 4(b), of the 1970 Illinois Constitution allows only counties having more than 200,000 people to engage in classification. The rest of the State's counties are required by article IX, section 4(a), of the 1970 Illinois Constitution and sections 1(24) and 20 of the Revenue Act (Ill. Rev. Stat. 1971, ch. 120, pars. 482(24), 501) to assess all real property within their boundaries at 50% of its fair market value.[1] Thus residential and farm property in Franklin County, which cannot practice classification, may well receive a higher percentage assessed valuation than residential and farm property in Cook County, which does practice classification.

■■ The defendants argue that this difference, allowed by article IX, section 4(b) of the 1970 Illinois Constitution, is an arbitrary discrimination against them in violation of the equal protection clause of the fourteenth amendment to the United States Constitution. The Illinois Supreme Court considered an identical argument in *People ex rel. Kutner v. Cullerton*, 58 Ill. 2d 266, 319 N.E.2d 55, and said that the complexity of properties and problems in counties having more than 200,000 people made this division of counties on the basis of population reasonable. Thus, the Illinois Supreme Court decided that article IX, section 4(b) of the 1970 Illinois Constitution does not contravene the equal protection clause of the United States Constitution. This court is bound by that determination.

■■ The defendants' second argument fails because the defendants did not prove that the fixing of the 1972 property tax multipliers at the level of the 1971 multipliers discriminated against them by forcing them to pay a higher rate of real estate tax in 1972 than landowners in other

[1] Sections 1(24) and 20 of the Revenue Act (Ill. Rev. Stat. 1971, ch. 120, pars. 482(24), 501) have been amended by P.A. 79-703, effective September 3, 1975. The amendments require counties which do not classify real property to assess all real property within their boundaries at 33 1/3%, rather than 50%, of its fair market value.

counties paid. To succeed with an argument based upon the equal protection of the laws, a party must at least show that he has been discriminated against by the statute or action about which he complains. *Farmers & Mechanics Savings Bank v. Minnesota*, 232 U.S. 516, 58 L. Ed. 706; *Darnell v. Indiana*, 226 U.S. 390, 57 L. Ed. 267, 33 S. Ct. 120; *for a discussion of problems concerning the setting of Illinois' property tax multipliers*, see *Hamer v. Lehnhausen*, 60 Ill. 2d 400, 328 N.E.2d 11.

The defendants' third argument will next be considered. The category of farmers, which the defendants allege suffers from discrimination under Illinois' system of real estate taxation, is not a suspect classification, such as a classification based upon race, alienage, or national origin. (See *Graham v. Richardson*, 403 U.S. 365, 372, 29 L. Ed. 2d 534, 541-42, 91 S. Ct. 1848.) Moreover, the defendants do not, as farmers, assert any right which is recognized as fundamental, such as the right to vote or the right to travel among the States. (See *Dunn v. Blumstein*, 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995.) Illinois' system of real estate taxation, as applied to farmers, therefore, need not be subjected to strict judicial scrutiny under the equal protection clauses of the United States Constitution and the 1970 Illinois Constitution. It thus does not give rise to a heavy burden of justification for the collector as the representative of the State of Illinois, and it can be regarded as constitutional in its application to farmers even without a finding that its present impact upon farmers is necessitated by a compelling governmental interest. *Hunter v. Erickson*, 393 U.S. 385, 392, 21 L. Ed. 2d 616, 622-23, 89 S. Ct. 557; *Dunn v. Blumstein*, 405 U.S. 330, 339, 31 L. Ed. 2d 274, 282, 92 S. Ct. 995.

Because the standard of strict judicial scrutiny is not appropriate for reviewing the effect of the real estate tax upon farmers in Illinois, the standard of review ordinarily used in equal protection cases must be employed. This standard does not prohibit all discrimination in the name of equal protection of the laws; it forbids only invidious or arbitrary discrimination by a statute or other State action. (*Ferguson v. Skrupa*, 372 U.S. 726, 732, 10 L. Ed. 2d 93, 98, 83 S. Ct. 1028; *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 79, 55 L. Ed. 369, 377, 31 S. Ct. 337.) The discriminatory effect of a statute upon a particular class of people is not invidious or arbitrary if it has a reasonable basis, that is, if it has a rational relationship to a legitimate State purpose. (*Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 172, 31 L. Ed. 2d 768, 777, 92 S. Ct. 1400.) In the field of taxation, a State legislature has especially broad discretion, and a classification or discrimination established by a tax statute will readily be found to have a rational relationship to a legitimate State purpose. *Madden v. Kentucky*, 309 U.S. 83, 84 L. Ed. 590, 60 S. Ct. 406; *People ex rel. Kutner v. Cullerton*.

Does the burden cast upon farmers by Illinois' system of real estate taxation, which consumes about 21% of the gross income of most farmers as opposed to only 2% of the gross income of the average Illinois citizen, have a rational relationship to a legitimate State purpose? A legitimate State purpose can be discerned: the efficient raising of revenue for the State of Illinois and its political subdivisions by means of a tax on real property. See *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001; *Savings & Loan Society v. Multnomah County*, 169 U.S. 421, 42 L. Ed. 803.

The burden placed upon farmers by Illinois' scheme of real estate taxation is the direct result of calculating real estate taxes solely on the basis of the assessed value of land, without regard to the size of landowner's income. Because farmers must make a tremendous investment in land in order to receive only a modest income, real estate taxes consume a disproportionately large percentage of their income. The question whether this tax burden denies farmers the equal protection of the laws depends on whether calculating real estate taxes only on the basis of the assessed value of land, without regard to landowners' income, has a rational relationship to the objective of efficiently raising revenue by means of a tax on real property.

Calculating real estate taxes on the basis of land's assessed value alone has the virtue of simplicity and efficiency. Limiting real estate taxes to amounts not in excess of a certain percentage of landowners' income would make administration of Illinois' system of real estate taxation inefficient for several reasons. If such a limitation were adopted, the real estate tax due on any parcel of land could be determined only by considering how much other land was owned by the same person and how much income that person received during the year. The real estate tax payable on a parcel of land would not remain constant, but would change with every change in the land's ownership. Moreover, the existence of such a limitation would enhance the possibilities for tax avoidance and thereby decrease the revenue raised by real estate taxes.

■■ In view of the broad discretion that a State legislature has in the area of taxation, and the simplicity and efficiency that result from the existing method of calculating real estate taxes, the calculating of real estate taxes solely on the basis of land's assessed value, without regard to landowners' income, must be deemed rationally related to the objective of efficiently raising revenue by means of tax on real property. The use of this method of calculating real estate taxes, therefore, does not deny the equal protection of the laws to the defendants as farmers.

■■ The defendants' fourth argument presents a challenge, based upon the equal protection of the laws, to the constitutionality of Illinois' financing of public schools by an extensive reliance upon local real estate

taxes. Illinois' method of financing public schools was substantially changed by "An Act to amend Section 18—8 of 'The School Code' " (Pub. Act. 78-215, effective October 1, 1973; Ill. Rev. Stat. 1973, ch. 122, par. 18—8.[2]) Because this proceeding involves only real estate taxes for 1971 and 1972, Illinois' present method of financing public schools is not open to attack by the defendants.

During the years 1971 and 1972, school districts in Illinois drew most of their revenue from local real estate taxes. (See Ill. Rev. Stat. 1971, ch. 120, par. 635; 6 Record of Proceedings of the Sixth Illinois Constitutional Convention 297.) The differences in the equalized assessed valuations of real property located in the school districts resulted in a large disparity in the school districts' ability to raise revenue from real estate taxes. (Office of the Illinois Superintendent of Public Instruction, Final Report of the Superintendent's Advisory Committeee on School Finance 1 (1973).) As shown by an exhibit introduced by the defendants, in 1972 Franklin County had an equalized assessed valuation of only $3610.68 per capita, as compared to an average in the State of $5904.26 per capita. Upon this tax base Franklin County levied a real estate tax of $2.68 per $100 equalized

[2] The 1973 amendment to section 18—8 of the Illinois School Code (Ill. Rev. Stat. 1973, ch. 122, par. 18—8) did not change or eliminate Illinois' foundation program, but, rather, provided an alternate method for calculating the State aid that is given to school districts. The alternate method is known as a district power equalization plan, or simply as "DPE." (See Grubb, *First Round of Legislative Reforms*, 38 Law & Contemp. Prob. 459, 477 (1974).) A school district may choose to receive State aid under either the foundation program or the DPE.

The effect of Illinois' DPE is to guarantee to every school district opting for the plan a certain tax base upon which the school district may levy any rate of real estate tax up to a specified maximum rate. For elementary school (K-8) districts, the guaranteed tax base is $64,615 per pupil in weighted average daily attendance. The guaranteed tax base is $120,000 per pupil in weighted average daily attendance for high school (9-12) districts, and $42,000 per pupil in weighted average daily attendance for unit school (K-12) districts.

The maximum real estate tax rates for which the State will guarantee these tax bases is 1.95% for elementary school (K-8) districts, 1.05% for high school (9-12) districts, and 3.00% for unit school (K-12) districts.

If the voters of a school district covered by DPE approve a real estate tax rate not greater than the appropriate maximum rate, the State will pay the district an amount equal to the difference between the guaranteed tax base and the district's equalized assessed valuation, multiplied by the district's real estate tax rate.

These guaranteed tax bases and maximum tax rates combine to produce a maximum amount of revenue that the State will guarantee to school districts covered by DPE; that is, $1260 per pupil in weighted average daily attendance. ($64,615 x 1.95% = $1260; $120,000 x 1.05% = $1260; $42,000 x 3.00% = $1260.) Thus the State aid available to a poor school district is much greater under DPE than under Illinois' foundation program, which provides only $520 per pupil in average daily attendance.

Wealthy school districts will obviously continue to choose to be aided under the foundation program because it at least entitles them to the general apportionment of $48 per pupil in average daily attendance. Wealthy school districts, however, do not qualify for any State aid under DPE.

During the 1973-1974 school year, 64% of all school districts in Illinois, which included about 85% of all students in Illinois, chose to receive State aid under DPE. See Grubb, *First Round of Legislative Reforms*, 38 Law & Contemp. Prob. 459, 478 (1974).

assessed valuation which was above the State average of $2.64 per $100 equalized assessed valuation. Yet this tax raised only $462 per student enrolled in the county's public schools, $165 below the State average of $627 in real estate taxes per student enrolled in public schools. Illinois Department of Finance, Illinois Statistical Report for 1972, table 4-028.

To ameliorate the effect of such differences, the State of Illinois, in 1971 and 1972, distributed revenue from its common school fund to its various school districts. (See Ill. Rev. Stat. 1971, ch. 122, par. 18—1.) The formula for calculating the distribution to each school district was provided by section 18—8 of the Illinois School Code (Ill. Rev. Stat. 1971, ch. 122, par. 18—8). This formula was of a kind generally known as a foundation program. The characteristics of Illinois' foundation program were, and are, as follows.[3]

Section 18—8(1) of the Illinois School Code provided for a general apportionment to every school district of $48 per pupil in average daily attendance in the district. Under section 18—8(2) of the Illinois School Code, poor school districts were also paid an equalization quota.

Equalization quotas were calculated by multiplying a school district's equalized assessed valuation by a certain "qualifying" tax rate—.84% for elementary school (K-8) districts and high school (9-12) districts having a weighted average daily attendance of 100 or more, and 1.08% for unit school (K-12) districts. If the product of this multiplication for a district, plus the district's general apportionment from the State, totaled less than $520 per pupil in average daily attendance, the State was required to pay an equalization quota to that district which made up the difference between the actual total and the foundation level of $520, provided that the district levied a property tax rate at least equal to the applicable qualifying rate. See *Harte v. Lehnhausen*, 60 Ill. 2d 542, 544, 328 N.E.2d 543, 544.

Despite the tendency of Illinois' foundation program to equalize the revenue available to school districts, the defendants still assert that they and their children were denied the equal protection of the laws by Illinois' method of financing public schools in 1971 and 1972 because the school districts in Franklin County had a lower level of expenditure per pupil than that of other school districts.

Illinois' method of financing public schools, before 1973, was expressly held to be constitutional in *McInnis v. Shapiro* (N.D. Ill. 1968), 293 F. Supp. 327, *aff'd sub nom. McInnis v. Ogilvie*, 394 U.S. 322, 22 L. Ed. 2d 308, 89 S. Ct. 1197. That case, however, was displaced as authority by the comprehensive opinion of the United States Supreme Court in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278.

---

[3] *See* Note 2, *supra*.

The United States Supreme Court said in *Rodriguez* that the right to an education was not a fundamental right under the United States Constitution, and that the category of persons who reside in poor school districts did not amount to a suspect classification. Thus, Texas' method of financing its public schools, which was challenged in *Rodriguez* on the basis of equal protection of the laws, did not have to be subjected to strict judicial scrutiny.

Although the United States Supreme Court purported to apply, in *Rodriguez*, the standard of review ordinarily used in equal protection cases, it actually fashioned another standard which is more restrictive than the ordinary standard, but less restrictive than the standard of strict judicial scrutiny. The Court first said that the principle of local control of public schools was valid, and that it justified a State's reliance on local real estate taxes in financing public schools. The Court indicated, however, that discrimination among school districts caused by reliance upon real estate taxes would be tolerated only if it were not invidious. The invidiousness of such discrimination is measured by two factors: the adequacy of the education provided by the school districts of the parties who attack a State's method of financing its public schools, and the size of the disparity in expenditures per pupil between the school districts of those parties and wealthy school districts in the State. This suggests that a State's method of financing public schools might deny children in especially poor school districts the equal protection of the laws, and yet might be constitutional with respect to children in other school districts.

The burden of demonstrating, by evidence and reasoned argument, that the discrimination against parents and children residing in a poor school district is invidious, must fall upon the parties who attack the discrimination. (See *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 55, 36 L. Ed. 2d 16, 55-56, 93 S. Ct. 1278; *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 79, 55 L. Ed. 369, 377, 31 S. Ct. 337.) In the present case, the defendants have failed to carry this burden.

At trial, the defendants did not elicit any testimony concerning the discriminatory aspects of Illinois' method of financing public schools during 1971 and 1972. Although the defendants introduced in evidence several exhibits which contained information relevant to this subject, they made little effort to separate the information from the large volume of other material in the exhibits. The defendants have not offered an analysis of what the statistics included in their exhibits prove. They have not introduced evidence concerning the adequacy of the education provided by school districts in Franklin County, and they have not introduced evidence concerning the size of the disparity in expenditures per pupil between school districts in Franklin County and wealthy school districts in the State.

Because of this failure of proof by the defendants, Illinois' method of financing public schools during 1971 and 1972 cannot be found to have denied the equal protection of the laws to the defendants.

All the defendants' arguments, therefore, are rejected. The judgment of the circuit court of Franklin County, overruling the defendants' objections to real estate taxes levied upon their lands for 1971 and 1972, is affirmed.

Judgment affirmed.

KARNS, P. J. and JONES, J., concur.