John CANTRELL, in his official capacity as County Treasurer of Tulsa County, Oklahoma; and Cheryl Clay, in her official capacity as County Assessor of Tulsa County, Oklahoma, Appellants,

v.

David H. SANDERS, John V. LaPlant, and David W. Griffith taxpayer-property owners in Tulsa County, Oklahoma, Appellees.

No. 54125.

Supreme Court of Oklahoma.

March 25, 1980.

As Modified on Denial of Rehearing April 28, 1980.

S. M. Fallis, Jr., Dist. Atty., and John F. Reif, Asst. Dist. Atty., Tulsa, for appellants.

Barrow, Gaddis, Griffith & Grim by William Farrior, Tulsa, for appellees.

LAVENDER, Chief Justice:

This appeal is prosecuted by the County Treasurer and County Assessor of Tulsa County, Oklahoma. They appeal from a judgment of the District Court of Tulsa County granting a partial refund of ad valorem taxes to three taxpayers, David H. Sanders, John V. LaPlant, and David W. Griffith. The taxpayers asserted, and the district court held, that their property had been unequally taxed because it had been unconstitutionally assessed at a higher ratio than that applied to other real property in Tulsa County. We agree.

## I

In 1977 and 1978 the Tulsa County Assessor, who was then Wilson Glass, divided the real property in Tulsa County into ten categories, four of which had two sub-categories. Against the value of property in these various categories eight different "assessment percentages"—often called "ratios"—were applied to arrive at the assessment.[1]

The taxpayers' property was assessed as "Commercial-Industrial improved (Code E)" at 25% of the fair cash value. Sanders paid his 1977 taxes under protest and filed a suit for a refund in 1978. A year later LaPlant and Griffith did the same with their 1978 taxes. The cases were consolidated in the district court.

## II

The initial question before us on this appeal is whether the taxpayers could bring a suit for a refund in the district court without first seeking relief from the Tulsa County Board of Equalization. They filed their actions under 68 O.S.1971 § 2469, which provides for a direct suit for refund "[i]n all cases where the illegality of the tax is alleged to arise by reason of some action from which the laws provide no appeal."[2] The "action from which the laws provide no

1. The categories and ratios were as follows:

| Property Classification | Assessment Percentage |
|---|---|
| 1. Single family residential improved | 15.095% or 25.000% * |
| 2. Single family residential improved, new construction, incomplete | 7.500% or 15.095% ** |
| 3. Commercial-Industrial improved (Code E) | 25.000% |
| 4. Commercial-Industrial improved, new construction, incomplete | 15.000% |
| 5. Commercial-Industrial improved, where land value is at least twice the value of improvements | 15.000% |
| 6. Parking lots and miscellaneous | 12.000% |
| 7. Platted vacant land and nonagricultural tracts | 7.500% or 10.000% + |
| 8. Undeveloped plats (green plats) | 6.000% or 8.000% + + |
| 9. Agricultural use land (at "use value") | 15.095% |
| 10. Agricultural use land (at "market value") | 7.500% |

Footnotes:
* 15.095% on all changes applied. 25.000% on all unchanged carryovers from previous year.
** 7.500% on improvements. 15.095% on land.
+ 7.500% on all plats assessed as such for the first time. 10.000% on all carry-over plats from previous year.
+ + 6.000% on all undeveloped plats assessed as such for the first time. 8.000% on all undeveloped plats carried over from previous year.

2. Section 2469 reads in pertinent part:
In all cases where the illegality of the tax is alleged to arise by reason of some action from

appeal" that they attacked was that of the county assessor in applying different assessment percentages to different categories of property.

The assessor and treasurer contend that this is a matter of the "equalization" of the "assessed valuation" of the taxpayers' property, over which the county board of equalization has exclusive original jurisdiction.[3] Thus, they argue, the taxpayers failed to exhaust their administrative remedies and the district court was without jurisdiction to hear their cases.[4]

 Insofar as assessments are concerned, the authority of a county board of equalization is limited. Assessment involves two steps: (1) the valuation of property, and (2) the application of an assessment percentage to that value. The result is the "assessed valuation." A county board of equalization may "equalize, correct and adjust the assessed valuation of real and personal property," but only "by raising or lowering the *valuation . . . to conform to the fair cash value thereof . . .*"[5] The action of the county assessor that the taxpayers were challenging had nothing to do with the determination of the fair cash value of their property; rather, it was only the assessment percentage applied to their property that they attacked. A county board of equalization has no authority, constitutional or legislative, to set the assessment percentage, nor does it have the authority to raise or lower that percentage.

Setting the assessment percentage is the statutory duty of the county assessor pursuant to 68 O.S.Supp.1974 § 2435.[6]

 As the district court held, the setting of the assessment percentage is essentially a policy decision of the county assessor. The county board of equalization has no authority to alter this policy decision. To require the taxpayers to seek relief from the county board of equalization from the assessor's selection of an assessment percentage, as opposed to the appraisal of the property's value, would be futile. No appeal is provided for in the statutes from the assessor's selection of an assessment percentage; therefore, the provisions of section 2469 apply. The taxpayers could file a suit for a refund directly upon payment under protest. They did this, and the district court therefore had jurisdiction to hear their cases.

### III

 The next, and ultimate, question on this appeal is whether the actions of the Tulsa County Assessor in applying to these taxpayers' properties different assessment percentages from the percentages applied to other properties resulted in an unconstitutional unequal burden of taxation. We hold that it did.

Under the Tulsa County Assessor's system of assessment there are ten categories of real property, actually fourteen since

---

which the laws provide no appeal, the aggrieved person shall pay the full amount of the taxes at the time and in the manner provided by law, and shall give notice to the officer collecting the taxes showing the grounds of complaint and that suit will be brought against the officer for recovery of them. . . . All such suits shall be brought in the Court having jurisdiction thereof, and they shall have precedence therein. . . .

3. 68 O.S.1971 §§ 2459, 2460, 2468.

4. Section 2468(a) provides:
 The proceedings before the Boards of Equalization and appeals therefrom shall be the sole method by which assessments or equalizations shall be corrected or taxes abated. Equitable remedies shall be resorted to only where the aggrieved party has no

taxable property within the tax district of which complaint is made.

5. 68 O.S.1971 § 2459 (emphasis added).

6. Subsection (b) of section 2435 provides:
 The county assessor shall assess and value all property, both real and personal, which is subject to assessment by him, and shall place a separate value on the land and improvements in assessing real estate; and he shall do all things necessary, including the viewing and inspecting of property, to enable him to assess and value all taxable property, determine the accuracy of assessment lists filed with him, discover and assess omitted property, and determine the taxable status of any property which is claimed to be exempt from ad valorem taxation for any reason.

four have two sub-categories. Against the value of property in these various categories eight different percentages are applied to arrive at the assessed valuation, ranging from a high of 25.000% to a low of 6.000%. The result of this system is that fourteen different taxpayers in Tulsa County with properties of *equal value*, each falling into a different one of the fourteen categories, would pay eight different amounts of taxes. For example, if each of the fourteen properties had a use value of $100,000, the assessed valuations would range from $25,000 to $6,000. Then, assuming that against these assessed valuations a tax of 80 mills is levied,[7] the ad valorem taxes of these fourteen taxpayers with properties of equal value would range from a high of $2,000 to a low of $480. It is this disparity in tax burdens that the taxpayers here complain of.

Article 10, section 5 of the Oklahoma Constitution provides in part:

> Taxes shall be uniform upon the same class of subjects.

Under the Tulsa County Assessor's system, taxes are not uniform upon real property. Implicit in the argument of the taxpayers is that in this case the applicable "class of subjects" is all real property. The assessor and treasurer argue, however, that each category created by the county assessor is a "class of subjects" under the constitution. They make this argument under article 10, section 8 of the Oklahoma Constitution, as it was amended in 1972. We do not find the authority argued for in that provision.

The first sentence of article 10, section 8, which carries the heading "Valuation of property for taxation," reads:

> All property which may be taxed ad valorem shall be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair voluntary sale, except real property and tangible personal property shall not be assessed for taxation at more than thirty-five percent

(35%) of its fair cash value, estimated at the price it would bring at a fair voluntary sale.

All this does is establish the general rule that all property taxable ad valorem must be valued at its "fair cash value"—that is, its market value—and carve out the first exception to that rule. The first exception is that real property and tangible personal property may not be assessed at more than 35% of its market value.[8]

The second sentence of article 10, section 8 provides the second exception to the general rule. It reads:

> Provided, however, that no real property shall be assessed for ad valorem taxation at a value greater than thirty-five percent (35%) of its fair cash value for the highest and best use for which such property was actually used, or was previously classified for use, during the calendar year next preceding the first day of January on which the assessment is made.

The second exception is that the assessment of real property, in addition to being limited to 35% of its value, is further limited to 35% of its *use value*, as opposed to its market value. This sentence does *not* provide, or even intimate, that different properties of equal use values can be saddled with unequal tax burdens. Rather, it provides that all real property must be valued *at its use value*. In 1972 this was a new notion in Oklahoma ad valorem taxation. Previously, all assessments had been made on the basis of market value. The change was proposed by the Legislature and adopted by the People to protect land located in prime locations but used for agricultural purposes from grossly inflated valuations due to the proximity of metropolitan areas, industrial areas, highways, lakefront locations, or the like. Nothing in the language of the change indicates any purpose of allocating tax burdens.

7. In 1977 the average tax levy for Tulsa County was 83.30 mills.

8. By limiting the assessment to 35% of the value for real property and tangible personal property, the Constitution requires the application of a percentage to the value in order to arrive at the assessment, or "assessed value." This notion was first introduced in an amend-

ment to article 10, section 8 proposed by the Legislature in 1957, 1957 Okla.Sess. Laws p. 648, and adopted by the people in a special election on July 1, 1958. State Question No. 379; Referendum Petition No. 117. From Statehood until the 1958 amendment, the Constitution provided that all property of whatever sort had to be assessed at its full market value.

The third sentence of article 10, section 8 reinforces the assertion that the amendment was aimed at land used for agriculture. It reads:

Provided, further, that the transfer of property without a change in its use classification shall not require a reassessment based exclusively upon the sale value of such property.

An agricultural tract close to a city may have, for example, a value of $100,000 as farmland (use value), yet because of its location have a market value of $200,000. This proviso ensure that if the land is sold for $200,000, it will not be reassessed based exclusively upon the sale value so long as it continues to be classified for agricultural use.

■ The fourth sentence of article 10, section 8 is the most important for our purposes here. It reads:

In connection with the foregoing, the Legislature shall be empowered to enact laws defining classifications of use for the purpose of applying standards to facilitate uniform assessment procedures in this state.

The Legislature has enacted no such laws defining classification. Even if it had, however, as the district court held, the classification of property *per se* is not the issue here. The issue is whether a county assessor, by his actions in applying an assessment percentage to the value of property, may impose unequal tax burdens upon properties of different classifications, even if the basis for making the classifications is the "use" of the property. We hold that under article 10, section 5 of the Oklahoma Constitution, he cannot. Article 10, section 8, as amended in 1972, did not give that power to the county assessors. The plain language of the section tells us what the classifications are to be used for: "for the purpose of *applying standards to facilitate uniform assessment procedures* in this state." This purpose makes good sense. The amendment changed the standard for the valuation of real property from market value to use value. In order to value property according to its use, it is necessary to classify property according to its use. Entirely different procedures are used for the valuation of residential, commercial, industrial, and agricultural properties, and uniform standards of classification of property in order to facilitate the application of uniform procedures would be desirable. In fact, the Oklahoma Tax Commission and the county assessors have agreed upon and established general classifications.[9] The point remains, however, that the classifications are to be used "for the purpose of applying standards to facilitate uniform assessment procedures," *not* as a vehicle to allocate tax burdens.

The fifth sentence of article 10, section 8 provides that a wilful error by an assessor shall be deemed malfeasance; it has always been a part of the section and is not relevant here.

When one considers the language of the 1972 amendment as it was submitted to the People and enacted, as well as the language of the original legislative proposal and subsequent committee substitutes, it is clear that the only purpose of the amendment was to change our method of valuing real property.[10] The amendment did not and

---

9. These classifications were recommended by the Oklahoma Tax Commission to the Real Estate Committee of the County Assessors Association of Oklahoma on September 16, 1976, and were unanimously adopted by the Association at its 1976 Annual Convention. The Tulsa County Assessor, however, has not followed these classifications. There are only three of these classifications: residential, commercial-industrial, and agricultural.

10. For instance, the original legislative proposal read in pertinent part:

In assessing real property which is used exclusively for agricultural purposes, and which has been so used for at least two (2) successive assessment years immediately preceding an assessment date, the assessor shall consider no factors other than those relative to agricultural use if the fee simple owner of the real property makes application in writing to the assessor by the time and in the manner provided by the Legislature, for the assessment of the real property to be made on the basis of agricultural use. The Legislature shall define the term "agricultur-

was not intended to create multiple "classes of subjects" out of all real property for the purpose of allocating unequal tax burdens. Thus, real property remains one "class of subjects" and the mandate of article 10, section 5 that taxes be "uniform upon the same class of subjects" is not affected.

The refund judgment shall stand but that part of the trial court's decision which directs that "equal assessment percentage rate" be used "for the year 1980 and for all subsequent years" is modified by making that command apply with effect to the year 1981 and thereafter.

AFFIRMED.

IRWIN, V. C. J. and WILLIAMS, BARNES, SIMMS, HARGRAVE and OPALA, JJ., concur.

HODGES and DOOLIN, JJ., dissent.

al use" and shall establish the criteria for use by the county assessors in determining which real property qualifies for agricultural assessment and the factors to be considered by assessors in determining valuations on real property which qualifies for agricultural assessment. Upon the assessor's determination that the real property meets the qualifications of the section, it shall be assessed on the basis of agricultural use until such time as the fee simple owner or his successor in interest applies for assessment as otherwise provided by this Constitution, or until the real property is diverted to a use other than for exclusively agricultural purposes, or is sold. At the time real property assessed on the basis of agricultural use is diverted to a use other than for exclusively agricultural purposes, or an application is made by the fee simple owner for its assessment as other-

wise provided by this Constitution, the assessor shall change the tax classification on such real property and further shall levy and collect a one-time tax equal to the difference in the agricultural and nonagricultural use for the most recent three (3) years said property was assessed on its agricultural use. H.J.Res. 1005, 33d Leg., 1st Sess. (1971) (as introduced). Later committee substitutes referred to "farm and ranch" rather than "agricultural" property, and provided for a deferred tax, but retained the central concept of "use valuation." It was ultimately decided to submit to the People a proposal that the valuation of all land, not just agricultural land, be limited to its use value. That final proposal, the amendment as it now appears, was approved in the general election of November 1972.