**FAIR SCHOOL FINANCE COUNCIL OF OKLAHOMA, INC., an Oklahoma corporation, et al., Plaintiffs–Appellants,**

**v.**

**STATE of Oklahoma; George Nigh, Governor of the State of Oklahoma; Leslie R. Fisher, State Superintendent of Public Instruction; State Board of Education; Harry Shackelford, Jack Mace, Seay Sanders, Dr. C.B. Wright, R.E. Carleton, and E.L. Collins, members of the State Board of Education; and Leo Winters, Treasurer of the State of Oklahoma, Defendants-Appellees,**

**and**

**Independent School District No. 1 of Alfalfa County, Oklahoma, et al., Intervenors–Appellees.**

No. 56577.

Supreme Court of Oklahoma.

Nov. 24, 1987.

As Corrected Nov. 25, 1987.

M. David Riggs, Dianne L. Smith, Messrs. Chapel, Wilkinson, Riggs, Abney & Henson, Tulsa, for plaintiffs-appellants.

Jan Eric Cartwright, Atty. Gen., Kay Harley Jacobs, Judith Coleman Nichols, Asst. Attys. Gen., Oklahoma City, for defendants-appellees.

Joe L. Heaton, Messrs. Fuller, Tubb & Pomeroy, Oklahoma City, for intervenors-appellees.

Harry A. Woods, Jr., Mark S. Grossman, Messrs. Crowe & Dunlevy, Oklahoma City, successor counsel for plaintiffs-appellants.

Duke Halley, Woodward, successor counsel for intervenors-appellees.

OPALA, Justice.

This case challenges the constitutionality of Oklahoma's system of financing public elementary and secondary schools. The litigation focuses upon disparities in taxable wealth among the various school districts as well as the effect of those differences upon the fiscal ability of the poorer districts to provide their students with educational resources and opportunities comparable to those of the more affluent school districts. We hold that neither the United States nor the Oklahoma Constitution requires a funding regime that provides equal expenditures per child.

The plaintiffs brought this suit as a class action on July 16, 1980. The plaintiffs are Fair School Finance Council, Inc., an Okla-

homa non-profit corporation whose members include the boards of education of thirty-eight school districts, which at the time this action was commenced had a total of 179,669 children in average daily attendance;[1] fifty-four minor school children, who reside and attend public schools in these districts; and forty-eight residents who pay ad valorem taxes on properties within the districts.

The defendants named in the action are the State of Oklahoma; George Nigh, in his official capacity as Governor of the State of Oklahoma; Leslie R. Fisher, State Superintendent of Public Instruction; the State Board of Education, whose duties include apportioning and disbursing funds to school districts under the State Aid program; Harry Shackelford, Jack Mace, Seay Sanders, Dr. C.B. Wright, R.E. Carleton and E.L. Collings, members of the State Board of Education; and Leo Winters, Treasurer of the State of Oklahoma.

The plaintiffs sought a judgment declaring that the method of financing public education in Oklahoma violates the United States and the Oklahoma Constitutions. After the action was commenced, ninety school districts were allowed to intervene as additional defendants.[2] These defendants filed a motion for judgment on the pleadings, in which the named defendants concurred. Finding that the petition's allegations, even if true, failed to establish any basis upon which the Oklahoma school finance system might be declared unconstitutional under either the United States or Oklahoma Constitution, the trial court rendered judgment for all defendants.

**I**

## THE OKLAHOMA PUBLIC SCHOOL FINANCING SYSTEM

Article 1 § 5 of the Oklahoma Constitution provides for the establishment and maintenance of a system of public schools within the State.[3] Article 13 § 1 of the Constitution places the obligation of doing so upon the Legislature.[4] In its efforts to carry out this duty, the Legislature has designed a system of financing public elementary and secondary education which relies primarily on two sources of revenue— local and state sources. A third, minor source of funding is the federal government.

### A. Locally–Generated Revenue

The greatest local sources of revenue for financing public education are various ad valorem taxes levied on the real and personal property within the school districts. Each county must levy a tax of four mills on the dollar valuation of all taxable property in the county for school purposes. Unless a different method is provided by law, the proceeds of this levy must be apportioned among the county school districts based upon the legal average daily attendance [ADA] for the preceding school year.[5]

The school districts themselves also can levy taxes. Upon certification of need by the board of education any school district may levy an additional tax of fifteen mills on the dollar valuation of all taxable property in the district.[6] Upon the voters' approval, a district also may make an emergency levy of up to five mills and a local

---

1. The largest school district was Tulsa, with 49,538 in average daily attendance; the smallest was Nobletown, with 60.

2. The terms of 12 O.S.1981 § 1653 of the Uniform Declaratory Judgments Act provide in pertinent part that "[w]hen a declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration ..."

3. The terms of Art. 1 § 5, Okl.Const., provide: "Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the chil-

dren of the state and free from sectarian control; and said schools shall always be conducted in English: Provided, that nothing herein shall preclude the teaching of other languages in said public schools."

4. Article 13 § 1, Okl.Const., provides: "The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated."

5. See Art. 10 § 9(b), Okl.Const.

6. See Art. 10 § 9(c), Okl.Const.

support levy of up to ten mills. The emergency and local levies may only provide sufficient additional revenue to meet the district's needs for the fiscal year as determined by the local board.[7] Thus, the maximum ad valorem tax levy allowed by law for a school district's general operating fund is thirty-five mills on the value of the taxable property within the district.

Additional ad valorem taxes also may be approved by the district's voters for education-related purposes. Article 10 § 10 of the Oklahoma Constitution allows a levy of up to five mills for a building fund, which may be used for erecting or repairing school buildings and for purchasing furniture. Article 10 § 26 permits a school district to incur in any one year an indebtedness in an amount, including existing indebtedness, of up to five percent of the valuation of the taxable property of the district for all purposes. If there is an absolute need, a district may increase such indebtedness to ten percent for the purpose of acquiring or improving school sites, constructing, repairing, remodeling or equipping buildings, or acquiring school furniture or equipment.

Small local sources of revenue for financing public schools include certain dedicated taxes and fees, tuition and transfer fees, and proceeds from the sale or rental of property.

Because local sources of revenue are derived primarily from ad valorem taxes, the amount of that revenue varies greatly among the school districts. This variation may be caused by several factors, including differences in assessment ratios and in the methods employed to establish property values. The greatest factor is the difference in property wealth, upon which the tax is based, among the districts. These differences greatly affect the amount of revenue per pupil which each district can raise for the support of its schools.

This variation in property wealth can be seen by comparing the assessed valuation of property per ADA among the districts.[8] For 1978–79, the assessed valuation per ADA for all school districts in the state was $11,264.42. In contrast, all but five of the plaintiff school districts had assessed valuations per ADA below the state average; and the average among the plaintiff districts was only $7,780.40. The effect of these differences in property wealth among the districts becomes more apparent by comparing the amount of local revenue per pupil in ADA which is available to the districts. All of the plaintiff school districts levy the full thirty-five mills allowed by law; yet they still cannot raise as much revenue per pupil as can the wealthier districts, some of which levy at a lower rate. In addition, when this action was commenced, all of the plaintiff districts were levying the full five mills allowed by law for a building fund, and all but two levied a tax for a sinking fund. In contrast, thirty-eight of the remaining districts either had no tax, or were levying less than five mills, for a building fund, and one hundred seventy-four districts levied no tax for a sinking fund. Twenty school districts had no tax for either a building fund or a sinking fund.

The level of property wealth within a district also affects the amount of indebtedness which the district may incur for acquiring and improving school sites, constructing and equipping school buildings, and acquiring school furniture and equipment. As stated above, the state constitution prevents a district from becoming indebted beyond a certain level, even though the district's voters may be willing to tax

---

7. Art. 10 § 9(d) and (d–1), Okl.Const.

8. The statistical information in this opinion is based on data in the plaintiffs' petition and attached exhibits. The defendants' motion for judgment on the pleadings is in the nature of a demurrer and serves to test the legal sufficiency of the pleadings, and admits as true every material fact properly stated therein. Whatever is attached to the petition also stands admitted when a demurrer or motion for judgment on the pleadings is directed to that pleading. See *Resolute Insurance Company v. Fred F. Fox Company*, Okl., 487 P.2d 704, 706 [1971] and *Jones v. Liberty Plan of America, Inc.*, Okl., 418 P.2d 920, 923 [1966]. The statistical data in the petition and exhibits are therefore treated as true in our discussion of the financial picture of the school districts.

themselves at greater rates to satisfy such indebtedness. This limitation obviously affects all school districts of the State; but it has a greater impact upon the less wealthy ones, whose maximum levels of indebtedness naturally are much smaller.

## B. State–Generated Revenue

The other primary source of revenue for public schools is the State itself. State sources of revenue include various taxes designated for school purposes, proceeds from the permanent school fund and monies allocated for specific programs or expenditures. The most important source, State Aid,[9] was designed to allow the State and the local school districts to work together to provide full educational opportunities for every child in Oklahoma.

The State Aid program consists of two parts, Foundation Program Aid and Incentive Aid.[10] The Foundation Program consists of a certain amount of money per pupil which the Legislature has determined to be necessary to operate a minimum program within a school district. From this amount are subtracted various sums, known as Foundation Program Income, which are received by a district from certain sources. One of these items is the net assessed valuation of the property within the district during the preceding year multiplied by fifteen mills. In theory, Foundation Program Income reflects a district's wealth and ability to support itself. A transportation supplement is added to the difference between the Foundation Program and Foundation Program Income. The total of these is Foundation Aid.

In addition to Foundation Aid, a district also may receive certain funds known as Incentive Aid.[11] The Incentive Aid formula has a two-fold purpose: (1) to reflect the district's property valuation per ADA in relation to the average valuation per ADA within the State and (2) to recognize the effort, in the form of mills exceeding fif-

teen, which the district makes by way of levies to finance its schools. The formula includes minimum and maximum amounts which the school districts may receive. As a result, districts which otherwise would not qualify for Incentive Aid, or would qualify for only a smaller amount, receive at least the minimum amount; and districts whose need is greater may not receive more than the maximum amount. All districts receive some Incentive Aid, with the poorest districts receiving only about twice as much as the richest.

In addition to the monies distributed through Foundation and Incentive Aid, a large portion of the funds appropriated for education are allocated to "flat grants" to all school districts. These grants have been awarded on a purely categorical basis, without consideration of the district's financial ability. Some grants have been distributed through the State Aid program for special education, vocational education and transportation. The largest allocation of this type has been for school personnel salary increases. The Legislature has increased these grants over the years; and so the percentage of the total education funds which are allocated to the State Aid program has become smaller.

In recent years state resources have begun to constitute a greater percentage of total school revenues. As recently as 1968–69, local sources accounted for more than half the revenues received by the districts. After that time period, this figure began to decline and the percentage provided by the State began to increase. In 1978–79 the districts received 53% of their total revenues from the State and only 36% from local sources.

## C. Federally–Generated Revenue

A third source of revenue for financing public education is the federal government. Most of these funds are granted on a cate-

**9.** 70 O.S.1981 §§ 18–101 through 18–123.

**10.** See 70 O.S.1971 § 18–109 (repealed by Okl. Sess.L.1981, Ch. 347 § 50). Since this action was commenced, the State Aid statutes have been amended and Incentive Aid is now called

Salary Incentive Aid. See 70 O.S.Supp.1987 § 18–109.2 [Okl.Sess.L.1987, Ch. 204, § 81, at p. 1012].

**11.** See footnote 10, *supra*.

gorical basis and restricted to specific uses designated by federal law. In 1978–79 federal funds constituted 11% of the revenues received by Oklahoma school districts. These federal funds cannot be used to reduce State Aid.[12]

In short, the present system of financing public education permits a wide difference in the amount of revenues available per pupil among the several school districts. Local sources vary primarily because of differences in property wealth among the districts. State Aid provides some additional support but does not equalize the total amount of funds per ADA which is available through both local and state sources.

## D. The Plaintiffs' Constitutional Argument

The plaintiffs claim the present system violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and several provisions of the state constitution because the system fails to provide "equal educational opportunities" for all children in the State. Although they do not define the phrase "equal educational opportunities," the plaintiffs allege only that the educational opportunities which they are able to provide or receive are "materially inferior" to those of other, wealthier school districts. Thus, by "equal educational opportunities" the plaintiffs mean equal revenues per ADA. With this in mind, we next examine the plaintiffs' claims.

## II

### PLAINTIFFS' MOTION TO REMAND

■ Before considering the merits we address the desirability of reviewing this case in light of events that have occurred since the appeal was commenced. While the case has been under consideration, the plaintiffs filed a motion to remand the case to the trial court for further reconsideration for two reasons. First, since the time that the action was commenced, the Legis-

lature has amended the school financing statutes, and so the case does not reflect the current state of the law and its effect on the plaintiffs. Second, some of the student plaintiffs have graduated or their families have moved from the school districts; and because these plaintiffs no longer have a justiciable interest in this action, others should be substituted for them.

Although this court may take cognizance of facts occurring during the pendency of an appeal which adversely affect the court's capacity to administer effective relief,[13] we decline to remand the case to the trial court for several reasons. First, this case involves a challenge to the State's system of financing public education and so presents an issue of great public interest and not merely the rights of private parties. Second, the legislative amendments have not greatly changed the basic system of funding nor equalized the amount of revenues per ADA available to each district; and so the primary issues still exist. Third, if other plaintiffs were substituted for those who have graduated or moved from the school districts, given the great number of children and parents involved, it is probable that changes would continue to occur. Fourth, these changes have not rendered the controversy moot and so have not affected our ability to administer effective relief if warranted.

## III

### CONSTITUTIONAL CHALLENGE TO OKLAHOMA'S SYSTEM OF AD VALOREM TAXATION

■ At the outset we are faced with a challenge to certain elements of the school finance system that has been before this court in recent years. We believe that we should address this issue before considering other aspects of the plaintiffs' claims.

As stated earlier, local revenues are derived primarily from ad valorem taxes and vary greatly because of differences in property wealth among the school districts.

**12.** 70 O.S.1981 § 18–104(A).

**13.** *Lawrence v. Cleveland County Home Loan Auth.*, Okl., 626 P.2d 314, 315 [1981].

The plaintiffs claim that these variations are compounded by other factors. First, taxable property is valued less frequently in some counties than in others. Second, the county assessors have not employed a standard method in valuing the property in the respective counties. Third, different classes of property are valued by different methods, even within the same county. Finally, there has often been a wide variation in the assessment ratios imposed on the value of taxable property, both among the districts and within the districts themselves.

Because of these alleged defects, the plaintiffs claim that the very foundation of the ad valorem system of taxation—the valuation of taxable property—is unconstitutionally discriminatory. As a result, any formula for distribution of State Aid based on the assessed valuation of property contains the same problems and is also unconstitutional.

Issues relating to assessment procedures for purposes of ad valorem taxation have been before this court since 1975. They are dealt with in three cases that are styled *State of Okl. ex rel. Poulos v. State Bd. of Equal.*[14] and in *Cantrell v. Sanders.*[15] The purpose of this litigation has been to ensure taxpayer equality through the uniform application of the laws governing ad valorem taxation. In *Poulos I* we held that (1) the Legislature's manifest intention was to equalize ad valorem assessments, (2) a system which does not equalize ad valorem assessments throughout the state is unfair and invidiously discriminatory and (3) it is the mandatory constitutional and statutory duty of the State Board of Equalization to adjust and equalize the valuation of taxable property of the several counties in the State.[16] We also held that the United States and Oklahoma Constitutions do not require precise uniformity but only a rate which is inherently and basically fair to all citizens.[17]

Because the State Board of Equalization failed to establish a suitable plan of compliance, we directed in *Poulos II* that the Board satisfy its duty by establishing a definite percentile equally applicable to all counties with permissible deviations not to exceed three percentage points above or below the assessment rate.[18]

In *Cantrell* we held that the county assessor is statutorily required to set an assessment percentage uniformly applicable to all real property within the county.[19] We also held that under Article 10 § 8 of the Oklahoma Constitution real property is to be assessed at no more than thirty-five percent of its use value.[20] Furthermore, we expressed a desire that uniform standards of classifying property be established in order to facilitate the application of uniform procedures for valuation.[21]

Because the wide diversity of assessment percentages applied by county assessors had been increasing and the Board had failed continuously to equalize such assessments, we finally ruled in *Poulos III*—in accordance with recommendations by the Oklahoma Tax Commission for statewide equalization—that all property subject to ad valorem taxation would be assessed at twelve percent of its taxable value with permissible inter-county deviations of not more than three percentage points above or below the mean. In addition, we held that the three classifications of real property and the methodology for determining the value of property in each class, as approved by the Board in 1981, should apply for the year 1982 and thereafter until changed by the Board or the Legislature.[22]

While we are aware of the inequities demonstrated by the *Poulos* and *Cantrell* cases, nevertheless we reject the plaintiffs' assertion that these render the present

14. Okl., 552 P.2d 1134 [1975] (*Poulos I*); Okl., 552 P.2d 1138 [1976] (*Poulos II*) and Okl., 646 P.2d 1269 [1982] (*Poulos III*).

15. Okl., 610 P.2d 227 [1980].

16. *Poulos I, supra* note 14 at 1136–1137.

17. *Poulos I, supra* note 14 at 1137.

18. *Poulos II, supra* note 14 at 1139.

19. *Cantrell v. Sanders, supra* note 15 at 229.

20. *Cantrell v. Sanders, supra* note 15 at 230.

21. *Cantrell v. Sanders, supra* note 15 at 231.

22. *Poulos III, supra* note 14 at 1273–1274.

school financing system unconstitutional. Article 10 of the state constitution created the system of ad valorem taxation which was then vitalized in 68 O.S.1981 §§ 2401 et seq. No allegation was made in the proceeding below that this system as designed is unconstitutional or intended to create inequities. Rather, the plaintiffs' attack is directed at alleged violations by the county assessors, the Oklahoma Tax Commission and the State Board of Equalization, none of whom is party to this action. If the practices of these officials or agencies are deficient, then these may be challenged in a proper suit. Moreover, there is an obvious and substantial difference between such deficiencies and the relief which the plaintiffs seek in this case. The fact that there may be flaws in the administration of the ad valorem tax does not support a claim that the entire school finance system is unconstitutional simply because some of its revenues are derived from those taxes.

We find support for today's pronouncement in two other factors. First, a report by the Oklahoma Tax Commission in July, 1983 showed that seventy of the state's seventy-seven counties were found to be in compliance with the guidelines for assessment ratios established in *Poulos III.*[23] Of those counties in compliance the lowest ratio was 9.01 and the highest was 13.42. The noncomplying counties were ordered by the State Board of Equalization to raise their property valuations [24]—which they all subsequently did [25]—in order to bring their assessment ratios into compliance with the guidelines.

Second, 70 O.S.Supp.1986 § 18–109.1 is designed to provide for greater equalization of State Aid with respect to determining the "chargeable valuation" of taxable real property. This section provides that, for the purpose of financial support through the State Aid formula, the real property portion of the valuations for school districts in counties having an assessment ratio in excess of 12% shall be computed at only 12%.[26] For those counties which have an assessment ratio of between 9% and 12% and which are not certified to have a revaluation program, the real property portions are to be computed at 12%.[27] The purpose of these provisions is to eliminate any differences in assessment ratios among the several counties insofar as these affect the distribution of State Aid. Those counties whose assessment ratios are below the level charged by the statute will be encouraged to raise them to avoid being penalized by the formula.

Because all counties of the state have established assessment ratios within the guidelines set by this court, and the present State Aid formula is designed to minimize the effects of any actual variations in the ratios among the counties, we find that the plaintiffs have failed to allege an actionable claim that the present system of financing public education is unconstitutional on that basis. The question remains whether the plaintiffs have alleged other facts sufficient to support a claim under the United States or the Oklahoma Constitution.

## IV

### CONSTITUTIONAL CHALLENGES UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT, UNITED STATES CONSTITUTION

█ The plaintiffs claim that the Oklahoma school financing system violates the

**23.** This information is based on July 12, 1983 Ratio Study Findings and Recommendations of the Oklahoma Tax Commission for Equalization of Ad Valorem Tax Assessments.

**24.** This information is based on July 29, 1983 order and notice of the State Board of Equalization directed to Cherokee, Dewey, Major, Mayes, Muskogee, McCurtain and Woodward Counties. Dewey County was later found to be in compliance (see July 29, 1983 minutes of the State Board of Equalization).

**25.** This information is based on revised Annual Abstract of Valuation and Assessments submitted by the six counties listed in footnote 24 *supra* to the State Board of Equalization.

**26.** See 70 O.S.Supp.1986 § 18–109.1(1).

**27.** See 70 O.S.Supp.1986 § 18–109.1(2) and (3).

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Section 1 of that amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This clause is intended to safeguard the quality of governmental treatment against arbitrary discrimination.[28] Under equal protection analysis, legislative enactments ordinarily are presumed to be valid.[29] This presumption disappears when the statutory classification impacts upon a fundamental right or a suspect class or if the classification rests on grounds wholly irrelevant to the achievement of the state's objective.[30] In these situations, a more scrutinizing review will be employed to determine the constitutionality of the legislation.

■ The United States Supreme Court dealt with the constitutionality of financing public education in *San Antonio Independent School District v. Rodriguez*,[31] which involved an equal protection challenge to the financing system in Texas. Under that system, apart from federal assistance, each school district received funds from the state and through local ad valorem taxation. The state's contribution under the "Minimum Foundation Program" was designed to provide an adequate minimal educational offering in every school in the state. In addition, the state made payments to each district for specific purposes such as teachers' salaries. Each district supplemented this aid through an ad valorem tax on property within its boundaries. In some districts, the local property tax contribution was insubstantial, whereas in others the local share may have exceeded the total Foundation grant. Although local differences were attributable in part to differences in the rate of taxation or in assessment practices, the greatest disparities resulted from differences in the amount of the assessable property within the districts. Local sources constituted approximately 41% of the revenues available for public education.

The plaintiff brought an action on behalf of school children who resided in districts having a low property tax base, claiming that the system's reliance on local property taxation violated equal protection requirements because of substantial inter-district disparities in per-pupil expenditures.

In determining the appropriate standard of review for purposes of equal protection analysis, the United States Supreme Court rejected the strict scrutiny test for such legislation. First, the Court held that no suspect classification based upon wealth had been shown. It is not sufficient to establish simply that (1) the burdens of paying are greater for some than for others, and (2) there are only relative differences in the quality of the benefits received rather than an absolute deprivation thereof. In short, the court stated, "at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages."[32] The plaintiffs here do not claim that the children in districts having relatively low assessable property values are receiving *no* public education, but rather that they enjoy fewer educational opportunities than those available to children in districts having more assessable wealth.

Nor does this case involve a "fundamental right" in the sense of one among the rights and liberties protected by the federal constitution. The Court in *Rodriguez* recognized the importance of education, acknowledging that it is "perhaps the most

28.  *Wilson v. Foster,* Okl., 595 P.2d 1329, 1332 [1979].

29.  *McGowan v. State of Maryland,* 366 U.S. 420, 424–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 [1961]; *Salsburg v. State of Maryland,* 346 U.S. 545, 553, 74 S.Ct. 280, 284, 98 L.Ed. 281 [1954]; *Atchison, T. & S.F.R. Co. v. Matthews,* 174 U.S. 96, 104, 19 S.Ct. 609, 612, 43 L.Ed. 909 [1899]; *Kimery v. Public Service Co. of Oklahoma,* Okl., 622 P.2d 1066, 1069 [1981]; *Application of Oklahoma Turnpike Authority,* Okl., 416 P.2d 860,

879 [1966] and *Board of Comn'rs. v. A.C. Davis & Sons,* 184 Okl. 258, 86 P.2d 782, 783 [1939].

30.  See cases cited at footnote 29 *supra.*

31.  411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 [1973].

32.  *Rodriguez, supra* note 31, 411 U.S. at 24, 93 S.Ct. at 1291.

important function of state and local governments." [33] But the Court held that the importance of a service performed by the state does not determine whether it must be regarded as fundamental for purposes of the Equal Protection Clause; rather, the issue is whether there is a right to education explicitly or implicitly guaranteed by the Constitution.[34] The Court found that education was not among the rights so guaranteed, especially where only relative differences in spending were involved and *where no charge could be made that the system fails to provide each child with an opportunity to acquire at least the basic minimal skills necessary to enjoy constitutionally protected rights.*[35]

The Supreme Court also gave several other reasons why strict scrutiny was inappropriate for the Texas school finance system. First, this standard has been employed where the challenged legislation has deprived or interfered with the free exercise of some fundamental right or liberty. But the Texas system did not restrict or deny anyone the right to an education. To the contrary, the system was intended to extend public education and to improve its quality. Second, such a challenge is a direct attack on the way in which the state has chosen to raise and disburse state and local tax revenues. Third, the area of education "presents a myriad of 'intractable economic, social and even philosophical problems.' " [36] In such a case, the Court reasoned, it is better to defer to the legislature's wisdom and to require only that the system be shown to bear some rational relationship to legitimate state purposes.[37]

The purpose behind the Texas system which the Supreme Court found to be legitimate was local control. The Texas system was responsive to the competing forces of (1) the desire by society to have educational opportunity for all children and (2) the desire of each family to provide the best education it can afford for its own children. While assuring a basic education for every child, the system permitted and encouraged a large measure of participation and control at the local level. In this regard the Texas system constituted a " 'rough accommodation' of interests in an effort to arrive at practical and workable solutions." [38] Although the system resulted in unequal expenditures between children residing in different districts, the Supreme Court held that the system was not so irrational as to be invidiously discriminatory. Rather, the Texas system "abundantly satisfied" the traditional constitutional standard of rationally furthering a legitimate state purpose or interest.[39]

The Court reaffirmed the *Rodriguez* decision in *Plyler v. Doe.*[40] In that case the Court struck down as unconstitutional under the Equal Protection Clause a Texas statute which barred from public education children who were not "legally admitted" into the United States. Once again stating that education is not a fundamental right guaranteed by the Constitution, the Court held that where a state *completely denies* an education to a discrete group of innocent children, the state must show that this furthers some substantial state interest.[41]

The present case does not involve a class-based denial of public education which would be incompatible with the Equal Pro-

**33.** *Rodriguez, supra* note 31, 411 U.S. at 29, 93 S.Ct. at 1295, quoting *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 [1954].

**34.** *Rodriguez, supra* note 31, 411 U.S. at 33–34, 93 S.Ct. at 1297.

**35.** *Rodriguez, supra* note 31, 411 U.S. at 36–37, 93 S.Ct. at 1298–1299.

**36.** *Rodriguez, supra* note 31, 411 U.S. at 41, 93 S.Ct. at 1301, quoting *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed. 2d 491 [1970].

**37.** *Rodriguez, supra* note 31, 411 U.S. at 37–44, 93 S.Ct. at 1299–1303.

**38.** *Rodriguez, supra* note 31, 411 U.S. at 55, 93 S.Ct. at 1308.

**39.** *Rodriguez, supra* note 31, 411 U.S. at 55, 93 S.Ct. at 1308.

**40.** 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 [1982].

**41.** *Plyler v. Doe, supra* note 40, 457 U.S. at 230, 102 S.Ct. at 2402.

tection Clause. The plaintiffs here have not alleged that they have been *absolutely denied* a free public education, *nor that they are not receiving an adequate one.* Instead, they claim only that they are not able to provide as much money per pupil as do other districts. Under the decisions in *Rodriguez* and *Plyler,* such distinction does not constitute a denial of equal protection of the laws under the Fourteenth Amendment.

The plaintiffs apparently acknowledge that *Rodriguez* is the controlling authority in this area. But they claim that before the application of *Rodriguez* can be determined, factual development is necessary to show (1) whether there is a legitimate, articulated state purpose to the Oklahoma system, and (2) whether there is any rational relationship between such purpose and the present method of financing public education. They also allege that the Oklahoma system is unconstitutional even under the *Rodriguez* standard because this system differs from that of Texas.

Article 18 of the School Code, 70 O.S. 1981 §§ 18–101 et seq., provides for the present State Aid program. Section 18–101 contains a "declaration of legislative intent, policies and principles" relative to that article. This section provides in pertinent part:

"The Legislature hereby declares that this act is passed for the general improvement of the public schools in the State of Oklahoma; to provide the best possible educational opportunities for every child in Oklahoma; and to have a more beneficial use of public funds expended for education; and this act shall be liberally construed to attain these goals within the purview of the following principles and policies: * * * "

Following this text is a series of ten "principles and policies" by which the public school support system should be guided. Among those enumerated in § 18–101 are (1) that the school system be designed to strengthen and encourage local responsibility for control of public education, with the maximum public autonomy and responsibility remaining at the local level; (2) that the

system assure that state and local funds are adequate for the support of a realistic foundation program; and (3) that state support be extended to all local districts regardless of their wealth, thereby developing a sense of broader responsibility and permitting the exercise of local initiative through flexible taxation. In short, § 18–101 creates a partnership between the state and the local districts in support of education, with a strong emphasis on local control.

The plaintiffs claim that the purpose of State Aid is "to provide the best possible educational opportunities for every child" in the state, and that the present system of financing public education fails to achieve this purpose because it does not equalize per-pupil expenditures for each district. This purpose is but one among several enumerated in § 18–101. Moreover, although equalization of funding may be a desirable objective, there simply is nothing in the statute to suggest that this is necessary beyond the requirements of the Foundation Program.

The plaintiffs also claim that local control is not the purpose of the school finance system but was raised by the defendants because it was held to be a legitimate state purpose in *Rodriguez.* There is simply no doubt that local participation and control are an objective of the Oklahoma scheme, because these are expressly mentioned in 70 O.S.1981 § 18–101. It is well established that where the legislature explicitly states its intentions, that statement of intent is not open to question.[42] In addition, this statute was enacted in 1971, almost two years before the *Rodriguez* decision. Because the objective of local control over education is one which is both constitutionally legitimate and explicitly intended by the Legislature, there is not a factual issue to be determined in this regard.

The plaintiffs also assert that there is doubt as to whether the Oklahoma system actually furthers local control of education. They argue that the system does not provide the same degree of fiscal flexibility to

---

42. *Mid–Continent Pipeline Co. v. Stephens Coun-*  *ty,* Okl., 312 P.2d 883, 885 [1957].

all districts and that local control could be preserved under other systems that would result in great equality in educational expenditures. The Court acknowledged these arguments in *Rodriguez* but found them insufficient to support a constitutional challenge there. While admitting that reliance on local taxation for school revenues provides less freedom of choice regarding expenditures for some districts, the Court held that a system may not be struck down simply because other methods may involve lesser disparities.[43] The relative desirability of a system, as compared to alternative methods, is not constitutionally relevant as long as there is some rational basis for it.

The plaintiffs next argue that *Rodriguez* is not applicable here because of differences in the Texas and Oklahoma systems. We agree that *Rodriguez* does not automatically foreclose an examination of the Oklahoma financing system and that differences in each state's system may be considered. We do not find that the two systems are so dissimilar that a different result should be reached here.

Despite the similarities described above, there is a clear difference between the Texas and Oklahoma systems. Article 10 § 9 of the Oklahoma Constitution limits the amount of ad valorem tax which may be levied for a school district's general operating fund, and Article 10 § 10 limits the amount which may be raised by ad valorem taxes for a building fund. In addition, Article 10 § 26 limits the amount of indebtedness which a school district may incur in any one year to an amount, including existing indebtedness, up to ten percent of the valuation of the taxable property within the district. The plaintiffs allege that they have imposed upon themselves the full amount of these taxes but still are unable to raise as much money as can wealthier districts.

The Court recognized this problem in *Rodriguez*. Since the ceiling there did not bar any desired tax increase in any district at that time, the Court declined to rule on the constitutionality of such limitations.[44] We do not believe that these restrictions render the present financing system unconstitutional. The purpose of the limitations on incurring indebtedness is to require school boards to conduct their operations on a cash basis and to prevent their pledging future revenues; and the United States Supreme Court previously has held that such limitations are valid.[45] It is also reasonable and proper for the people of a state to limit the degree of taxation to which they will subject themselves.

In sum, we find no requirement under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution that a state's school financing system guarantee equal expenditures per child.

## V

## CONSTITUTIONAL CHALLENGES UNDER THE VARIOUS PROVISIONS OF THE OKLAHOMA CONSTITUTION

The plaintiffs also claim that the present school finance system violates several provisions of the Oklahoma Constitution. A finding that the system does not violate the federal constitution does not preclude review under our state constitution.[46] In

---

43. *Rodriguez, supra* note 31, 411 U.S. at 50–51, 93 S.Ct. at 1305–1306.

44. *Rodriguez, supra* note 31, 411 U.S. at 50, 93 S.Ct. at 1305, footnote 107.

45. "We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program." *Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 [1969]. See also *District Township of Doon v. Cummins*, 142 U.S.

366, 371, 12 S.Ct. 220, 221–222, 35 L.Ed. 1044 [1892] and *Buchanan v. Litchfield*, 102 U.S. (12 Otto) 278, 287–288, 26 L.Ed. 138, 139 [1880].

46. State courts are free to consider the merits of a constitutional challenge under their own constitutional provisions, and they are free to do so independently of United States Supreme Court opinions, even when the state and federal constitutions are similarly or identically phrased. See *Cooper v. State of California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 [1967] and *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 [1975].

fact, since the decision in *Rodriguez*, a number of courts have examined school finance systems under their respective state constitutions, with the majority ruling in favor of constitutionality.[47] These courts have relied greatly on the particular language and interpretive history of their respective constitutions; and since the provisions differ from state to state, we do not find these cases especially helpful here.

The plaintiffs argue first that the present system of financing denies them the equal protection of the laws. Although the Oklahoma Constitution does not contain a provision identical to the equal protection clause in the federal constitution, it is well established that a like guarantee exists within our state constitution's due process clause.[48]

Although education is not a fundamental right guaranteed by the federal constitution, the plaintiffs contend that it is a fundamental interest under our state constitution and so strict judicial scrutiny must be applied to the financing system. This argument is based upon what the plaintiffs call the "*Rodriguez* syllogism" or test. In *Rodriguez* the Court held that education was not one of the rights explicitly or implicitly guaranteed by the federal constitution, and so strict judicial scrutiny would not be employed to review legislation affecting education. Conversely, the plaintiffs here argue that since education is mentioned in our state constitution,[49] it is a fundamental interest or right, and therefore strict judicial scrutiny must be applied to the method of financing public education.

The argument that education is a fundamental interest or right under our state constitution leads to several other questions. First, there is the question whether the *mere mention* of a subject in that constitution makes that subject a fundamental interest or creates a fundamental right. Second, if it does not, then the question arises whether *by its terms* the constitutional provision creates a fundamental right. Third, assuming that a fundamental right is created, there is the question of the *exact nature* of the right or guarantee. Once this has been ascertained, then we must also determine the appropriate standard of judicial review.

We believe that there is a difference here insofar as a subject may be mentioned in the state constitution. If we were to adopt the *Rodriguez* test, then educational opportunity arguably would be a fundamental interest in Oklahoma entitled to strict judi-

47. Those cases upholding school financing systems as constitutional include the following: *Shofstall v. Hollins*, 110 Ariz. 88, 515 P.2d 590 [1973]; *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 [1975]; *People of Illinois ex rel. Jones v. Adams*, 40 Ill.App.3d 189, 350 N.E.2d 767 [1976]; *State ex rel. Woodahl v. Straub*, 164 Mont. 141, 520 P.2d 776 [1974]; *Bd. of Educ. of City Sch. Dist., etc. v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 [1979]; *Olsen v. State*, 276 Or. 9, 554 P.2d 139 [1976]; *Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 [1979]; *Lujan v. Colo. State Board of Education*, 649 P.2d 1005 [Colo.1982]; *McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156 [1981] and *Milliken v. Green*, 390 Mich. 389, 212 N.W.2d 711 [1973].

Among those cases finding the system unconstitutional are the following: *Pauley v. Kelley*, 162 W.Va. 672, 255 S.E.2d 859 [1979]; *Serrano v. Priest*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929 [1976]; *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359 [1977]; *Washakie County School Dist. No. One v. Herschler*, 606 P.2d 310 [Wyo. 1980]; *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273 [1973]; *Seattle Sch. Dist. No. 1 of King Cty. v. State*, 90 Wash.2d 476, 585 P.2d 71 [1978];

*Dupree v. Alma School Dist. No. 30 of Crawford County*, 279 Ark. 340, 651 S.W.2d 90 [1983] and *Buse v. Smith*, 74 Wis.2d 550, 247 N.W.2d 141 [1976].

48. Our due process clause in Art. 2 § 7, Okl. Const., has a definitional range that is coextensive with its federal counterpart. See Vth and XIVth Amendments, U.S. Const.; *McKeever Drilling Co. v. Egbert*, 170 Okl. 259, 40 P.2d 32, 35 [1935]; The latter [and hence our own] contains a built-in anti-discrimination component which affords protection against unreasonable or unreasoned classifications serving no "important governmental objectives." *Davis v. Passman*, 442 U.S. 228, 234, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 [1979] and *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 [1954]. We have accordingly recognized the presence of the same equal protection component in our own due process clause. *McKeever Drilling Co. v. Egbert, supra* and *Personal Loan & Finance Co. v. Oklahoma Tax Com'n.*, Okl., 437 P.2d 1015, 1019 [1968].

49. See, for example, Art. 13, Okl.Const., which is devoted to education.

cial scrutiny. While that test may be applicable under the United States Constitution, it is not appropriate for determining fundamental rights under our state constitution. This is so because of the basic and inherently different nature of the two constitutions.

The United States Constitution is one of restricted authority and delegated powers.[50] By contrast our state constitution is not one of limited powers where the State's authority is restricted to the four corners of the document.[51] Rather, the Oklahoma Constitution addresses not only those areas deemed fundamental but also others which could have been left to statutory enactment. While the Congress of the United States may do only what the federal constitution has granted it the power to do, our state Legislature generally may do, as to proper subjects of legislation, all but that which it is prohibited from doing.[52] Thus, under the Oklahoma Constitution, fundamental rights are not necessarily determined by whether they are provided for within the document. We accordingly reject the *Rodriguez* test as inappropriate.

Nor is equal educational opportunity—in the sense of equal expenditures per pupil—guaranteed by the express terms of our state constitution. Article 1 § 5 states that "[p]rovisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all children of the state...." Article 13 § 1 provides that "[t]he Legislature shall establish and maintain a system of free public schools wherein all children of the State may be educated." These sections merely mandate actions by the Legislature to establish and maintain a system of free public schools. They do not on their face guarantee equal expenditures per pupil.

Assuming that education is a fundamental interest, the question remains as to

what is the exact nature of the interest guaranteed. In *Miller v. Childers*[53] this court discussed the Legislature's obligations under Article 13 § 1 of the Constitution. We held that the school system should provide our youth with "such degree of learning that when the work is done they may be educated young men and women" and with "such mental and moral training as will make them useful citizens of our great commonwealth."[54] Again, in *School Dist. No. 25 of Woods County v. Hodge,* this court held that State Aid was "intended to aid in assuring a minimum educational program for all children of the state."[55] We also stated that the program was designed "to insure uniformity of opportunity to all children of the state to receive at least the degree of instruction embraced by the minimum program." Thus, the right guaranteed in Article 13 § 1 *is a basic, adequate education according to the standards that may be established by the State Board of Education.* There is nothing in our previous decisions which suggests that the Legislature must provide equal expenditures per pupil in order to accomplish this objective.

This conclusion is supported by other constitutional provisions. Article 13 § 1a, which provides for the appropriation of funds for the support of public schools, states in part:

[s]uch monies shall be allocated to the various school districts *in the manner* and by a distributing agency *to be designated by the Legislature;* ... [and] *the amount of state funds to which any school district may be entitled shall be determined* by the distributing agency *upon terms and conditions specified by the Legislature,* and provided further that such funds shall be in addition to apportionments from the permanent school fund...." [Emphasis added.]

**50.** See *United States v. Darby,* 312 U.S. 100, 312 U.S. 657, 61 S.Ct. 451, 85 L.Ed. 609 [1941].

**51.** Art. 5 § 36, Okl.Const.; *Spearman v. Williams,* Okl., 415 P.2d 597, 600 [1966] and *Miller v. Childers,* 107 Okl. 57, 238 P. 204, 206 [1924].

**52.** *Miller v. Childers, supra* note 51.

**53.** See footnote 51, *supra.*

**54.** *Miller v. Childers, supra* note 51 at 206.

**55.** 199 Okl. 81, 183 P.2d 575, 581 [1947].

As is clear from this section, state funds do not have to be allocated to the districts on an equal per-pupil basis, but may be distributed as the Legislature sees fit.

■■■ We find no authority to support the plaintiffs' contention that the school finance system should be subjected to strict judicial scrutiny. We previously have held that our constitution places few restrictions on the Legislature's power to provide a school system for the state and the methods employed by the Legislature in doing so are largely within its discretion. When these methods are challenged, the only justiciable question is whether the Legislature acted within its powers. Where the constitutionality of an act of the Legislature is in question, all reasonable doubt will be resolved in favor of its validity and the act will be declared constitutional unless it can be clearly demonstrated that the Legislature acted arbitrarily and capriciously.[56] Such a demonstration has not been made here.

■■■ The plaintiffs also argue that compulsory school attendance requires that schools be equally funded. They contend that it is a violation of both due process and equal protection to require children to attend schools under penalty for them and their parents [57] without requiring some standard of equality in the public support of those schools. Whatever merit such argument may have, it is of no avail where a charge fairly cannot be made that a child is not receiving *at least a basic adequate education.*

■■■ The plaintiffs also claim that the present school finance system violates Article 5 §§ 59 and 46 of the Oklahoma Constitution. We do not agree. Section 59 requires that general laws have a uniform operation throughout the state and that no special law be enacted where a general law can be made. Section 46 prohibits, *inter alia,* any special or local law "regulating the affairs" of school districts. There was no allegation in the petition that the school finance laws do not apply to all districts in the state. Rather, the plaintiffs' claim essentially is that the *impact* of the school finance system differs from district to district. It is well established—and the plaintiffs admit—that a law can be general even though it does not operate universally and alike on all persons throughout the state.[58] In deciding whether a law is "general" for the purposes of these provisions, we must look to see if there is a rational basis for the classification employed by the statute.[59] As stated earlier, there is a rational basis to support the present school finance system. In addition, the school finance laws cannot be said to regulate impermissibly the affairs of a school district merely because the district's financial situation limits the options available to it.

## IV

### MOTION FOR JUDGMENT ON THE PLEADINGS

■■■ At the trial level, the intervenors filed a motion for judgment on the pleadings,[60] in which the named defendants concurred. The trial court found that the facts alleged in the petition, even if true, did not establish any basis upon which the Oklahoma school finance system could be declared to have violated either the United States or the Oklahoma Constitution, and so granted the motion. The sole and decisive question for this court's consideration is whether the allegations of the pleadings

---

**56.** *School Dist. No. 25 of Woods County v. Hodge, supra* note 55 at 579; *Kimery v. Public Service Co. of Oklahoma, supra* note 29 at 1069; *Spearman v. Williams, supra* note 51.

**57.** See Art. 13 § 4, Okl. Const. and 70 O.S.1981 § 10–105.

**58.** *Barrett v. Board of Com'rs. of Tulsa County,* 185 Okl. 111, 90 P.2d 442, 446 [1939] and *Sanchez v. Melvin,* Okl., 418 P.2d 639, 641 [1966].

**59.** *Elias v. City of Tulsa,* Okl., 408 P.2d 517, 520 [1965]; *State v. Rockwell,* Okl., 443 P.2d 104, 105 [1968] and *Wilson v. Foster, supra* note 28.

**60.** The motion for judgment on the pleadings no longer exists under our current pleading code. See 12 O.S.Supp.1984 § 2012, and Committee Comments to that section. Because this action was commenced prior to the adoption of the new pleading code, we apply the test for judgment on the pleadings in existence at that time.

together with all inferences that may be fairly deduced from them, when viewed in the light most favorable to the plaintiffs, state facts sufficient to support a legal claim.[61]

A motion for judgment on the pleadings is in the nature of a demurrer in testing the sufficiency of the pleadings and presents a question of law as to whether the facts alleged are sufficient to state a cause of action.[62] Although this motion is not favored by the courts, judgment on the pleadings may properly be rendered where there is no material issue of fact for trial and the facts alleged cannot support an actionable claim.[63]

The plaintiffs alleged that the present school financing system denies them "equal educational opportunities." The plaintiffs do not allege that they or their children *are completely denied an education. Nor do they allege that the education they are able to provide or receive is in any way an inadequate one.* In fact, the plaintiffs admit that "no schoolchildren in this State are in imminent danger of receiving a wholly inadequate education."[64] Despite this, the plaintiffs seek to strike down an entire state-wide school financing system simply because it is unable to provide as much money per pupil as do the wealthier districts. Because we find that neither the United States nor the Oklahoma Constitution requires the school funding regime to guarantee equal expenditures per child, at least where there is no claim that the system denies any child a basic, adequate education, we must decline to disturb the trial court's judgment.

The judgment of the trial court is accordingly affirmed.

HARGRAVE, V.C.J., and HODGES, LAVENDER and SUMMERS, JJ., concur.

DOOLIN, C.J., and SIMMS and WILSON, JJ., dissent.

KAUGER, J., disqualified.

SIMMS, Justice, dissenting:

I must respectfully dissent. Plaintiffs have presented a substantial and persuasive attack on the constitutionality of Oklahoma's public school financing system, however the Court has approved the constitutional sufficiency of the system although not a word of testimony or item of evidence had been presented to explain or defend it. There was no hearing. The trial court did not make any findings of fact or conclusions of law; the pleadings constitute the only record before us.

Plaintiffs argue that their petition raised material issues of fact that were controverted by defendants' answers, and that the trial court's judgment for defendants was erroneous. I agree.

The sole and decisive question for this Court's consideration is whether the allegations of the pleadings together with all inferences that may be fairly deduced from them, when viewed in the light most favorable to the plaintiffs, state facts sufficient to support a legal claim. *Bill v. Anderson,* Okl., 363 P.2d 849 (1961).

In *Tooley v. O'Connell,* 77 Wis. 422, 253 N.W.2d 335, 341 (1977), plaintiffs sought a declaratory judgment that Wisconsin's statutory plan for financing public schools from ad valorem tax revenues violated the plaintiffs' constitutional rights. The appellate court reversed the trial court's dismissal of the complaint on grounds that it failed to state a cause of action, noting:

"The plaintiffs have set forth constitutionally protected rights that they allege have been infringed upon by the defendants.... The plaintiffs have additionally alleged, with particularity, the respects in which the statutory scheme is constitutionally violative. Regardless of the merits of their constitutional claims, it

**61.** *State v. Guardian Funeral Home,* Okl., 429 P.2d 732, 735 [1967].

**62.** *State v. Guardian Funeral Home, supra* note 61 at 735.

**63.** *Mires v. Hogan,* 79 Okl. 233, 192 P. 811, 815 [1920].

**64.** See Brief in Support of Appellants' Motion to Remand, at p. 23.

cannot be said that the plaintiffs have failed to raise a justiciable controversy."

This is a complex area and the Court's willingness to make factual determinations and draw legal conclusions from a silent record, will probably lengthen rather than shorten the time finally necessary to effect a remedy for obvious financial problems of the schools.

It is true, as the Court points out, that some other state courts have upheld their financing systems against attack on various state constitutional grounds. Not one of those decisions involved a situation such as this, where a school financial scheme attacked on constitutional grounds because of state wide financial disparities was upheld without a trial. In *Board of Education of City of Cincinnati v. Walter*, 58 Ohio St.2d 368, 390 N.E.2d 813 (1979), for example, the Ohio court detailed the extensive factual examination upon which the trial court and, in turn, the appellate court had based their decision. There the trial on the issues consisted of 78 days of testimony with 77 witnesses, the introduction of approximately 2400 exhibits and the record had 7530 pages of transcript. The trial judge adopted 400 findings of fact and 35 conclusions of law.

We are, I believe, the first state to reject an attack such as this on a financing scheme without allowing the plaintiffs a trial to attempt to prove their case.

I cannot agree with the Court's treatment of the federal and state constitutional arguments, but primarily, I believe it improvident that we are passing on the questions now at all. In the absence of evidence, findings of fact and conclusions of law, it is merely gratuitous to decide that our financing scheme does not deny plaintiffs equal protection of the laws under the Fourteenth Amendment, that the *Rodriguez* test does not apply to state constitutional analysis, that education is not a fundamental right under our state constitution and that our financing scheme therefore need not be examined with strict security.

It should be with great trepidation that we sweep the right to a public education away from the protection of heightened constitutional scrutiny, for no governmental function occupies such a unique position in our heritage.

The overwhelming importance and fundamental nature of the right to an education was pointedly recognized by this Court in *Smartt v. Board of County Com'rs of Craig County*, 67 Okl. 141, 169 P. 1101 (1917), where we stated:

"The very purpose of creating a state government by the people is to delegate thereto the performance of certain functions looking to the common safety and welfare, and the necessity for the performance of these functions through the agency of the state and its various subdivisions is the sole object for its creation. The people have provided in the Constitution for a full set of state officers, and have created separate departments and co-ordinate branches of the government and various municipal subdivisions, and confided to each the performance of certain duties which are made mandatory because necessary for the protection and well-being of the people composing the state. There has been much controversy among publicists and thinkers and much conflict in the decisions of the courts as to the proper and necessary limitations upon the powers delegated to the different departments and arms of the state government, but it is conceded by all that certain necessary fundamental functions must always be actively exercised in order to preserve the existence of the state and secure to the people the rights guaranteed to them, among which are the right to life, liberty, the possession of property, and the pursuit of happiness, and should the state become so impotent as to be unable to discharge these functions, there would result a failure of the purposes for which government was established.

\* \* \* \* \* \*

"In addition to the protection of life, liberty and property and the conservation of the public peace, health, and safety, there are certain other functions of government which are elementary and indestructible; such for example as the

administration of justice in the courts *and the maintenance of a public school system for the education of all the children residing within the state;* and to permit the performance of these mandatory duties to depend upon the making of provision therefor by certain subordinate municipal officers would render the life of the state and the security of the citizen precarious indeed." At 1102, 1104. (E.A.)

I believe plaintiffs have pleaded a cause of action. Their allegations, which must be accepted as true, were controverted and raise material issues of fact. Plaintiffs set forth constitutionally protected rights which they allege were infringed upon by defendants acting pursuant to our financing laws. They also alleged, with particularity, the manner in which these laws violate their constitutional rights.

In my opinion, the trial court erred in sustaining defendants' motion for judgment on the pleadings, and the majority errs in affirming it. I would reverse and remand this action and give plaintiffs an opportunity to prove their case.

ALMA WILSON, Justice, dissenting:

If the majority holds that the patchwork of legislative "planning" which is before this Court upholds the original intent of the framers of the Oklahoma Constitution, I must dissent. The majority intimates that if we had been presented a case alleging that the school funding resulted in inadequate education, the question may have been answered differently. Although I cannot read the intent of the framers to mean absolutely equal funding, I read it clearly to say that it must be fair.

The issue is: "Does the present legislative scheme carry out the original intent of the constitution in their provision for the schooling of all the children in the State of Oklahoma?" If year after year there is legislatively perpetuated greater and continued disparity favoring those districts with more legislative clout then the clear purpose and intent of the constitutional framers for schooling has been violated. The most egregious example of this perpetuated unfairness is the "hold harmless" formula found in title 70, § 18–112 and revised each year since 1981. By legislative recognition it was designed to soften the impact on current projects of "favored" schools and permit funding to be gradually withdrawn. By this formula, the legislature implicitly recognized that the legislative supplement of less well funded schools was due to geographic bad luck. If a child were schooled in a bleak ad valorem based community, the legislature first recognized that the ad valorem base had to be supplemented to enable "fair schooling" in those counties without adequate ad valorem based funding. Then "hold harmless" was the device to prevent favored economic status from being removed all at once from school districts which were relying on current programs. But the phase-out contemplated has never occurred.

Such legislation is the educational equivalent of sending one child to a thrift shop to buy his school clothes while the neighboring child is sent to the tailor to have his clothes handmade. I suppose we can say that both were clothed.

I am not persuaded by the list of authorities from sister states that find their state funding schemes constitutional in spite of inequality. Where Article 1, § 5; article 11, §§ 2, 3, and 4; and all of article 13 of the Oklahoma Constitution concern education and its funding, one can be safe in concluding that the subject was of great importance to the framers. Black's Law Dictionary, Fifth Edition, defines "fundamental law" as "The law which determines the constitution of government in a nation or state, and prescribes and regulates the manner of its exercise. The organic law of a nation or state; its constitution." Black's defines "fundamental rights" as "Those which have their origin in the express terms of the Constitution or which are necessarily to be implied from those terms." Citing, *Sidle v. Majors,* 264 Ind. 206, 341 N.E.2d 763 (1976).

I would find that education is a fundamental right in this State, and that the funding for education must be fair if not equal. The legislature has stated that its

intent is to provide an equitable funding formula for all the school districts in this State. 1987 Okla.Sess.Laws, ch. 204, § 81 (amending 70 O.S.Supp.1986, § 18–109.2): Section 83 of that same chapter would reduce the "hold harmless" grant by one-third. Section 81(A) provides that no district having a per pupil revenue in excess of three hundred percent of the average per pupil revenue of all districts shall receive any State Aid or Supplement in State Aid. Perhaps this new legislation will come nearer making the school funding fair. I would hold in abeyance further action in order to give the legislature an opportunity to remove "hold harmless" altogether, and to permit them to meet responsibly their duty to *fairly* fund the common schools of Oklahoma.